

# Missouri Court of Appeals

## Southern District

### Division One

DAMIEN T. BRYAN,          )
)
     Movant-Appellant,    )
)
v.                        )     No. SD36990
)     Filed: April 28, 2022
STATE OF MISSOURI,     )
)
     Respondent-Respondent.  )

### APPEAL FROM THE CIRCUIT COURT OF CAMDEN COUNTY

Honorable Patricia S. Joyce, Special Judge

## AFFIRMED

Damien Bryan (Movant) requested Rule 29.15 post-conviction relief after he was convicted of felony driving while intoxicated (DWI) and two counts of murder in the second degree.[1] Those charges were filed in connection with a multi-vehicle collision that resulted in the deaths of the drivers of two other vehicles involved in the collision. After an evidentiary hearing, the motion court denied Movant's amended motion on December 29, 2020. Movant appeals and presents seven points for decision. All points are premised on alleged ineffective

---

[1] All rule references are to Missouri Court Rules (2014).

assistance of trial counsel. Finding no merit in any of Movant's points, we affirm the order denying relief.

*Timeliness of Post-Conviction Motions*

After Movant was found guilty by a jury on the aforementioned charges, the trial court sentenced Movant to serve three years in the Department of Corrections (DOC) for DWI and 25 years in the DOC for each murder. The sentences for the murders were to run concurrently, and the sentence for DWI was to run consecutively to the murder sentences. We affirmed the trial court's judgment on direct appeal in *State v. Bryan*, 439 S.W.3d 781 (Mo. App. 2014).

Appellate courts have an independent duty to enforce the mandatory time limits for the initial and amended motions in Rule 29.15 and Rule 24.035. *See Bearden v. State*, 530 S.W.3d 504, 506 (Mo. banc 2017); *Price v. State*, 422 S.W.3d 292, 297 (Mo. banc 2014); *Huskey v. State*, 635 S.W.3d 886, 888 (Mo. App. 2021); *Harness v. State*, 611 S.W.3d 909, 912 (Mo. App. 2020). Our mandate issued on October 1, 2014. Movant filed an initial motion for Rule 29.15 post-conviction relief on December 26, 2014, in the Circuit Court of Cole County, Missouri.[2] This motion was timely because it was filed within 90 days after the date our mandate issued. *See* Rule 29.15(b) and (m).

The circuit court appointed the public defender to represent Movant on the same day the initial motion was filed. No public defender entered an appearance on behalf of Movant. Instead, the district defender sent a letter to the circuit court on January 12, 2015, notifying the court that the motion had been filed in the wrong county and should be transferred for

---

[2] The collision occurred in Cole County, but venue for the criminal trial was changed to Camden County following a mistrial in Cole County. The Cole County circuit judge who presided over the mistrial was assigned to the Circuit Court of Camden County to preside over the case there. Sentencing physically occurred in Cole County under the authority of the Circuit Court of Camden County.

disposition. On January 27, 2015, the case was transferred to the Circuit Court of Camden County (hereinafter referred to as the motion court).

On February 24, 2015, retained counsel entered an appearance on behalf of Movant, and filed an amended motion for post-conviction relief on April 24, 2015. The motion court subsequently determined that the public defender had abandoned Movant. That finding of abandonment meant the "cause shall proceed anew according to the provisions of the rule" pursuant to the holding in *Luleff v. State*, 807 S.W.2d 495, 498 (Mo. banc 1991). Therefore, the amended motion was timely because it was filed within 60 days of retained counsel's entry of appearance. *See* Rule 29.15(g).

**Standard of Review**

Movant bore the burden of proving the grounds asserted in his post-conviction motion by a preponderance of the evidence. *See* Rule 29.15(i); *McLaughlin v. State*, 378 S.W.3d 328, 337 (Mo. banc 2012). Our review of the denial of a Rule 29.15 motion is limited to determining whether the motion court's findings of fact and conclusions of law are clearly erroneous. Rule 29.15(k); *Williams v. State*, 168 S.W.3d 433, 439 (Mo. banc 2005). We will find clear error only if a full review of the record leaves us with a definite and firm impression that a mistake has been made. *Zink v. State*, 278 S.W.3d 170, 175 (Mo. banc 2009). We presume the motion court's findings and conclusions are correct. *McLaughlin*, 378 S.W.3d at 336-37. We "view the record in the light most favorable to the motion court's judgment, accepting as true all evidence and inferences that support the judgment and disregarding evidence and inferences that are contrary to the judgment." *Hardy v. State*, 387 S.W.3d 394, 399 (Mo. App. 2012). We also defer to the motion court's credibility determinations. *Smith v. State*, 413 S.W.3d 709, 715 (Mo. App. 2013). The following summary of favorable facts from the criminal trial has been prepared in accordance with these principles.

3

**Factual and Procedural Background**

Around 10:40 a.m. on August 31, 2011, Movant was driving a 1981 Ford F-150 truck northbound on South Country Club Spur in Cole County, Missouri. Movant was approaching a stop sign on Country Club Spur where it intersected with Route C. He intended to cross Route C to go onto Rumsey Lane. Movant's vehicle entered Route C and collided with an eastbound 2004 Lexus SUV driven by Joan Hamilton (Hamilton). The front end of the Ford caught the right front of the Lexus. The collision caused the Lexus to rotate clockwise almost 180 degrees. It tipped over onto its side with the bottom of the vehicle facing a westbound 1995 Chevrolet Blazer driven by Donald Edwards (Edwards). His Blazer collided with the bottom of the Lexus. That caused the Lexus to roll on top of the Blazer and then land on the ground next to it. Edwards was pronounced dead at the scene. Hamilton was transported to a hospital, where she later died.

The Missouri State Highway Patrol (MSHP) was notified of the collision, and Trooper Richard Dowd (Trooper Dowd) was dispatched to the scene at 10:48 a.m. Movant was being treated in an ambulance when Trooper Dowd arrived. He spent about five minutes with Movant. Movant informed Trooper Dowd that he had been crossing Route C when "he looked to the left, didn't see the vehicle, pulled out, and got hit." Movant had no visible injuries. Trooper Dowd administered a portable breath test (PBT) to Movant, and it indicated no presence of alcohol. Movant was then taken to the hospital.

After Movant was released from the hospital, he was interviewed again by Trooper Dowd. Movant gave the following description of how the collision took place:

> he was crossing … Route C from South Country Club Spur to go onto Rumsey; said he looked left, looked right, saw the vehicle to his right, looked left again; didn't see anything, looked right, thought he had time to make the crossover; and then got hit by the vehicle on the left [the Lexus driven by Hamilton] that he never saw.

4

Corporal M. A. Halford (Cpl. Halford) worked for the MSHP as a drug recognition expert (DRE). He had been certified by the International Association of Chiefs of Police as a DRE in July 2008. He became an instructor in standardized field sobriety testing in September 2008. In October 2009, he was also certified to be a DRE instructor. He placed all of his drug-recognition evaluations into a "rolling log," which he kept as a training tool to assess the accuracy of his evaluations. At the time of trial, Cpl. Halford testified that the percentage of his evaluations that were correct based on subsequent laboratory testing was "[a]pproximately 90 percent."

Cpl. Halford arrived at the accident scene a little after 11:00 a.m. After a brief stay there, he went to the hospital where Movant was being treated. Cpl. Halford interviewed Movant and recorded the audio of the interview. The interview took place within 45 minutes after the collision occurred. Movant said his "only injury [from the collision] at that point in time … was a whack to the ribs." During the interview, Cpl. Halford requested that Movant permit a blood sample to be drawn and given to law enforcement.[3] Movant gave his consent for the blood draw. A sample of Movant's blood was drawn into two vials by a nurse and given to Cpl. Halford at about 11:45 a.m. Cpl. Halford labeled the vials A and B. Vial B was "an extra in case something happened to the original vial."

During the interview, Cpl. Halford noticed that:

[Movant's] speech was mumbled at times during it, assumed a fast speech pattern. And then during the blood draw – or the prepping of the blood draw and waiting, he engaged conversation with Sheriff White. And during that conversation, he seemed to ramble, laugh, nervous laugh, kind of an inappropriate laugh, I felt, and continued on speaking with Sheriff White.

Cpl. Halford also observed:

---

[3] State law required that Cpl. Halford request "a blood sample and breath sample of all surviving drivers in fatal accidents." *See* § 577.029 RSMo Cum. Supp. (2010).

> [Movant's] fast speech pattern, his what we call bruxism. Bruxism is the clenching of the teeth. That's something that we look for in a DRE, in a drug recognition expert evaluation. It's a sign or a symptom of stimulant use. And he was exhibiting that.

Movant's pupils "were of normal, equal size [but] his eyes were a bloodshot or a reddened appearance." Movant's "pulse was above normal" and he sounded "winded [or] out of breath just speaking[.]" Prior to this incident, Cpl. Halford had briefly spoken with Movant on several occasions, and Movant had not exhibited any of these symptoms on those occasions.[4]

After the interview ended, Cpl. Halford secured the blood vials in his vehicle and retrieved items and forms to complete a DRE evaluation. Upon return to Movant's hospital room, Movant was suddenly "very agitated, standoffish" and argumentative and declined to perform field sobriety tests. Movant also said he "wanted a glass of water because he was thirsty and had a dry mouth."

Based on Cpl. Halford's observations, he believed that Movant was under the influence of a "central nervous system stimulant" and was impaired by that substance to an extent that it would have affected his ability to drive a motor vehicle. That category of drug includes the medication, Adderall, that Movant said he was prescribed and used daily. That category of drug also includes methamphetamine and cocaine. A therapeutic dosage of Adderall (i.e., a dose prescribed by a physician) should not cause the "psychophysical" symptoms Movant exhibited.

Cole County Sheriff Gregory White (Sheriff White) responded after the collision because his office acted as the coroner. Sheriff White arrived at the hospital around 11:40 a.m. and spent about fifteen minutes with Movant. Sheriff White had extensive experience

---

[4] The recording of Movant's interview was played for the jury. During deliberations, the jury requested to listen to the recording again and was permitted to do so.

6

and specialized training in the detection of narcotics use and the enforcement of narcotics laws. He was:

> trained about particular drugs, the effects of those drugs. And then by practice and experience when you're working with other narcotics officers and while you're working narcotics, you tend to develop – like any other experience, you develop methodologies of looking at people, making determinations based on the effects of those drugs [or drug categories].

Sheriff White also was "familiar with the impact of methamphetamine on the body or at least the symptoms that would be exhibited." While with Movant, Sheriff White noticed things that made him believe that Movant was potentially under the influence of a drug in the category of "[a]mphetamine, uppers[,]" which would include methamphetamine. That belief was based on the following observations:

> Pupils were normal to the ambient light, not larger or smaller to other people. Rapid hand movement. There was some fairly rapid eye movement. Voice was a little bit garbled. There was – How do I put this? There was clenching of teeth like he was trying to chew on something that wasn't there, having trouble getting through it.

MSHP Sergeant Paul Kempke (Sgt. Kempke) had specialized training as an accident reconstructionist and was part of "the major crash investigative unit[.]" This unit was "the top level of reconstruction" within the MSHP, and members of the unit generally worked only the most serious collisions. Sgt. Kempke was assigned to this collision because it involved fatalities and a possible felony charge. Based on his observations and reconstruction experience, Sgt. Kempke determined that:

1. at the stop sign on Country Club Spur, Movant had a clear view of Route C for over 600 feet looking to the west, and for over 1,000 feet looking to the east;

2. the speed limit on Route C was 60 miles per hour, and it would take over six seconds for a vehicle traveling the speed limit to travel 600 feet;

3. Movant's vehicle entered the intersection, and its front end caught the right-front passenger side of Hamilton's eastbound Lexus; and

4. Hamilton's Lexus then rotated, went onto its side, and collided with Edwards' Blazer in the westbound lane of Route C.

Using Hamilton's estimated speed at impact, Sgt. Kempke calculated that:

1. Movant stopped his vehicle 10 to 18 feet prior to the stop sign (based on Movant's statement that he stopped before entering the intersection);

2. Hamilton was "less than a football field away" when Movant pulled out; and

3. Movant's Ford was traveling 17 to 19 miles per hour at impact.

MSHP forensic toxicologist Gary Davis (Davis) worked in the MSHP crime laboratory. He was a member of the American Board of Forensic Toxicology with a certification as a forensic toxicology specialist. On September 8, 2011, he examined a sample of Movant's blood that had been drawn at the hospital. Davis determined that Movant's blood contained 193 nanograms of methamphetamine per milliliter. According to Davis, methamphetamine affects "the brain's ability to send and receive signals out to the body" and can have an impact on motor skills. One effect of the drug is that it "confuses the signals sent from the brain to the extremities, so they can have difficulties with coordination or doing what the brain is telling the arms or the legs to do." The most common therapeutic levels of methamphetamine are "between 20 and 50 nanograms" of methamphetamine per milliliter of blood, though there "have been reports of … over 50[.]" Davis opined that anything over a therapeutic level would cause impairment of an individual's motor skills, and that 193 nanograms of methamphetamine "would be way outside the range of therapeutic and considered abuse." According to Davis, methamphetamine is "rarely prescribed, but typically it's prescribed for narcolepsy and ADHD."

Forensic toxicologist Dr. Christopher Long (Dr. Long) worked for the St. Louis University School of Medicine, Department of Pathology. He also was the chief toxicologist

for St. Louis County. He had worked in the field of toxicology for over 30 years, and he was one of roughly 175 persons in the country who were board certified in forensic toxicology.

Dr. Long regularly taught about methamphetamine. Methamphetamine impacts an individual's motor skills directly through the nerves that control the muscles. A concentration of "193 nanograms per milliliter" would be "outside the therapeutic range" even for amphetamine, and would be "way outside anything that would be considered therapeutic" for methamphetamine. Dr. Long opined that 193 nanograms of methamphetamine per milliliter of blood would impair the body's ability to react appropriately and accurately, and it would absolutely impact a person's driving ability.

Dr. Long was familiar with another toxicologist, Dr. Barry Logan, who was the "chief toxicologist for Washington" and "an authority on methamphetamine[.]" In Dr. Logan's opinion, any methamphetamine in a person's blood results in impairment, and it is not safe to operate a vehicle with methamphetamine at any level.

### Discussion and Decision

Movant presents seven points for decision. All of them are based upon alleged ineffective assistance of counsel. To prevail, Movant had to satisfy a two-pronged test, as summarized in *Jones v. State*, 631 S.W.3d 682 (Mo. App. 2021):

> First, the movant must "show that counsel's representation fell below an objective standard of reasonableness." *Strickland v. Washington*, 466 U.S. 668, 688, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689, 104 S.Ct. 2052. Second, the movant must show that trial counsel's failure prejudiced him. *Id.* at 687, 104 S.Ct. 2052. To satisfy the prejudice prong under the *Strickland* test, movant is required to show there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *Anderson v. State*, 196 S.W.3d 28, 33 (Mo. banc 2006).

9

*Jones*, 631 S.W.3d at 685-86.[5]  If the court can dispose of an ineffectiveness claim because of a lack of sufficient prejudice, then that course should be followed.  *Esters v. State*, 554 S.W.3d 918, 924 (Mo. App. 2018).

*Point 1 – Failure to Investigate and Call Essential Witnesses*

In Movant's first point, he contends the motion court erred in denying Movant's claim that trial counsel was ineffective for failing to call Dr. Larry Slaughter (Dr. Slaughter) and Lieutenant Gary Hill (Lt. Hill) as witnesses at trial.  To prevail on a claim of ineffective assistance of counsel for failure to call a witness, Movant had to prove:  (1) trial counsel knew or should have known of the existence of the witness; (2) the witness could be located through reasonable investigation; (3) the witness would testify; and (4) the witness' testimony would have produced a viable defense.  *See Worthington v. State*, 166 S.W.3d 566, 577 (Mo. banc 2005).  The testimony of each witness from the evidentiary hearing is summarized below.

Dr. Slaughter was the physician who treated Movant at the hospital after the collision on August 31, 2011.  Dr. Slaughter's general area of practice was emergency medicine.  Dr. Slaughter had been trained in identifying whether a person is intoxicated by drugs or alcohol. Apart from the information contained in Movant's medical records, Dr. Slaughter had no independent recollection of Movant.  Movant arrived at the hospital at 11:25 a.m.  Dr. Slaughter saw Movant at 11:59 a.m., and Movant was discharged at 12:40 p.m.  Dr. Slaughter did not recall anything remarkable about Movant's vital signs.  In looking at Movant's eyes, nothing stood out to Dr. Slaughter that would be a sign of intoxication.  Movant's heart had a

---

[5] Whether counsel's performance conformed to the degree of skill, care, and diligence of a reasonably competent attorney is an "inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind." *Harrington v. Richter*, 562 U.S. 86, 110 (2011).  Trial counsel's subjective state of mind is irrelevant to that determination. *McLemore v. State*, 635 S.W.3d 554, 560 n.2 (Mo. banc 2021).

regular rate and rhythm, and nothing with regard to his heart rate indicated intoxication. Movant had a "contusion on his back where he'd struck something within the car" that was not serious. Dr. Slaughter's records do not include any findings that would indicate that Movant was intoxicated, but that is not necessarily something Dr. Slaughter would have noted in his records. Dr. Slaughter could not remember how long he was with Movant, but thought "it wouldn't have been very long" – maybe 15 to 20 minutes. On cross-examination, Dr. Slaughter said his evaluation of Movant's head, ears, eyes, nose and throat was "really pretty cursory" since Movant did not have any complaints. Dr. Slaughter also agreed that a person can be impaired or intoxicated, but not be exhibiting symptoms to the extent that he would have noted them in his report.

Lt. Hill was with the Cole County Sheriff's Department. He had received training about identifying drivers intoxicated by alcohol, but that training did not include identifying drivers who were intoxicated by drugs. Lt. Hill did have experience with people who were under the influence of drugs. When Cpl. Halford and Sheriff White were talking to Movant at the hospital, Lt. Hill may have been physically present for a portion of the time, but he was not listening to the conversation because of his other responsibilities. Movant was lying in bed, and Lt. Hill did not notice any signs of impairment. His contact with Movant was "quite limited[,]" and Lt. Hill was not evaluating Movant for impairment.

The motion court made the following factual findings with respect to the claim that counsel was ineffective for not calling these two witnesses:

> Dr. Slaughter was deposed subsequent to the trial in preparation for this matter and he was unable to provide any exculpatory or contradictory information regarding [Movant] during the short time [Movant] was in his care, therefore his testimony would have had no impact on the outcome of the trial in this matter[.]

> Lt. Gary Hill was not in the presence of [Movant] long enough to make any observations as to his level of impairment and indicated during his deposition

11

taken in preparation for this matter that he did not observe the [Movant] long enough to make any determinations. Therefore, any testimony given by Lt. Gary Hill at trial would not have had an impact on the outcome of the trial in this matter.

In its conclusions of law, the motion court stated:

When deposed, in furtherance of this action brought by [Movant], both witnesses indicated they would have been available to testify, however, neither witness established or supported any viable defense available to [Movant] as required and therefore this point fails to support [Movant's] claim of ineffective assistance of counsel.

These findings and conclusion are not clearly erroneous. Dr. Slaughter had no recollection of Movant, and the doctor spent a limited time examining Movant. Dr. Slaughter also acknowledged that a person can be impaired or intoxicated, but not be exhibiting symptoms to the extent that he would have noted them in his report. Similarly, Lt. Hill's contact with Movant was quite limited, and he was not observing Movant for impairment.

In addition, the evidence that Movant was impaired by methamphetamine at the time of the collision and in the hospital was strong. A laboratory examination of Movant's blood that had been drawn at the hospital showed Movant had a concentration of 193 nanograms of methamphetamine per milliliter of blood.[6] Movant's blood concentration of methamphetamine was much greater than a typical therapeutic blood concentration of 20 to 50 nanograms per milliliter. Two forensic toxicologists (Dr. Long and Davis) testified that a blood concentration of 193 nanograms of methamphetamine per milliliter would impair Movant's motor and driving skills. Both Cpl. Halford and Sheriff White noticed signs of Movant's impairment in an audio-recorded interview conducted at the hospital. The audio

---

[6] This evidence alone greatly lessened the significance of whether Movant was exhibiting behavior that indicated he had a stimulant in his system – he clearly had a significant concentration of methamphetamine in his blood.

12

recording was played for the jury, and the jurors were permitted to hear for themselves Movant's alleged speech patterns, grinding of his teeth, and inappropriate demeanor.

After reviewing the record, the motion court did not clearly err by denying Movant's claim that calling Dr. Slaughter or Lt. Hill as witnesses would have provided Movant with a viable defense.  Therefore, Point 1 is denied.

*Point 2 – Failure to Object to Improper Testimony*

Movant's second point contends the motion court clearly erred by denying the claim that trial counsel was ineffective for failing to object to improper testimony.  Movant argues that trial counsel should have objected to:  (1) Cpl. Halford referring to himself as a drug recognition "expert"; (2) Sheriff White testifying that he believed that Movant was under the influence of an amphetamine; and (3) Sgt. Kempke's opinions as to Movant's speed at the time of the collision and the implication that he ran a stop sign.  We will address each argument in turn.

## Cpl. Halford

The motion court did not clearly err by denying Movant's claim with respect to Cpl. Halford because the failure to object did not prejudice Movant.  "[A] law enforcement officer is allowed to testify as to his observations and opinions regarding intoxication."  **State v. Hoy**, 219 S.W.3d 796, 810 (Mo. App. 2007).[7]  As this Court noted in **Hoy**, however, "we have concerns that the use of this title" – drug recognition "expert" rather than examiner or evaluator – "could possibly confuse or mislead a jury."  **Id**. at 799 n.2.  Based upon our review of the record, that did not occur here.  Cpl. Halford fully explained his training to the jury, and also explained that his certification as a DRE was bestowed by the International Association

---

[7]  Based on this authority, Movant concedes in his brief that both Cpl. Halford and Sheriff White were entitled to opine on whether Movant was impaired.

of Chiefs of Police. Cpl. Halford never implied that this was anything more than a certification by a law enforcement organization following satisfactory completion of training and demonstration to the law enforcement organization of his competency of the knowledge imparted and skills taught. More importantly, a MSHP forensic toxicologist later examined Movant's blood sample drawn at the hospital, and determined that Movant had a blood concentration of 193 nanograms of methamphetamine per milliliter. Therefore, Cpl. Halford's opinion that Movant was under the influence of "a central nervous system stimulant" was not prejudicial, because it was cumulative to other properly admitted evidence.

Sheriff White

The same is true of Sheriff White's testimony that he believed Movant was under the influence of amphetamine. In light of the forensic evidence of methamphetamine in Movant's blood, there is no reasonable probability that the admission of Sheriff White's opinion changed the outcome of the trial.

Sgt. Kempke

With respect to Sgt. Kempke's opinion as to Movant's "speed at the time of the accident and the implication that he ran a stop sign[,]" the motion court denied this claim for the following reasons:

> Sgt. Kempke testified that he in fact calculated the accident with a number of variables with only one of those being the speed at which he believed [the eastbound driver Hamilton] was traveling. He further testified that he calculated [Hamilton's] speed at a range of 5 miles per hour under the speed limit up to 5 miles per hour over the speed limit. In addition, he did calculations as if [Movant] was in fact stopped at the stop sign prior to entering the highway and testified to the same.

> [Trial counsel] was not ineffective for failing to object to this calculation based on how Sgt. Kempke arrived at his calculations as it was not prejudicial to [Movant] and did not have a determinative impact on the outcome of the trial. [Movant] was at a cross road wherein he had a stop sign and was expected to stop and not enter the highway until it was safe to do so. However, the evidence was clear that [Movant] entered the highway when it was in fact not safe and

14

caused an accident that resulted in the death of [Hamilton and Edwards], which was in fact reckless.

These findings and conclusions are not clearly erroneous.

First, the trial transcript demonstrates that Sgt. Kempke did not state or imply that Movant ran the stop sign. Sgt. Kempke relied upon Movant's statement that he stopped before entering the intersection in order to determine the distance from Movant's stop to the point of impact of the collision. Sgt. Kempke calculated a starting point for Movant's truck of 10-18 feet before the stop sign.

Second, Movant's complaint about Sgt. Kempke's reliance on hearsay in calculating Hamilton's speed lacks merit. The gravamen of Movant's argument is that Sgt. Kempke used the out-of-court statements of Hamilton's ex-husband as to her driving habits and skills in estimating Hamilton's speed at impact. Sgt. Kempke was testifying as an accident reconstruction expert. "An expert may rely generally on hearsay evidence as support for opinions, as long as that evidence is a type reasonably relied upon by other experts in the field; such evidence need not be independently admissible." *State v. Gladden*, 294 S.W.3d 73, 75 (Mo. App. 2009). Movant did not present any evidence that information provided by a person with personal knowledge of an individual's driving habits and skills was not a type of hearsay evidence reasonably relied upon by other accident reconstructionists. Therefore, Movant failed to show that trial counsel's representation fell below an objective standard of reasonableness when she failed to object to the alleged improper testimony. Point 2 is denied.

*Point 3 – Failure to Object to Scientifically Unreliable Evidence*

In Movant's third point, he contends the motion court erred in denying Movant's claim that trial counsel was ineffective in failing to object to scientifically unreliable evidence. Movant identifies this evidence as the opinions of forensic toxicologists, Dr. Long and Davis, "that a person with 193 nanograms per milliliter of methamphetamine in their blood would be

15

impaired and unable to operate a motor vehicle." Citing **Frye v. United States**, 293 F. 1013

(D.C. Cir. 1923), Movant argues this testimony was scientifically unreliable because it was

not based upon "scientific principles generally accepted in the relevant scientific community."

The motion court denied this claim for the following reasons:

> While Dr. Long and Gary Davis testified to the blood level at which [Movant] would likely be impaired, [his] expert, Dr. Brown, also testified, and admitted under cross examination, that there was in fact a consensus among the scientific community that between 20 and 50 nanograms per milliliter is the level within the blood known as a therapeutic level. The level of methamphetamine present in the blood of [Movant] at the time of the incident was far greater than what is known within the scientific community as a therapeutic level. [Trial counsel] took great care in the use of her expert, Dr. Brown, to convince the jury that it was not widely accepted within the scientific community that methamphetamine would cause impairment at a particular level. However, Dr. Brown did testify that the levels considered therapeutic are widely accepted within the scientific community based on the research he presented and based his opinion on which is clearly in accordance with *Frye v. U.S.*, 54 App.D.C. 46, 293 F. 1013, 1014 (1923). … Both [of the State's experts] testified that there is a level recognized within the scientific community as therapeutic, but that the level present in [Movant's] blood was far outside what is recognized as therapeutic, hence their opinion that [Movant] was likely impaired at that level. To fail to object to this testimony did not prejudice [Movant] as his own expert testified that there are specific levels recognized as therapeutic and he testified as to what those particular levels are. While the expert disputes that [Movant] was in fact impaired, he did not dispute the levels recognized as therapeutic and was clearly allowed to offer his own expert opinion as to the same. Due to this, [Movant] was not prejudiced by the testimony of either Dr. Long or Gary Davis and [Movant] fails to meet his burden as to this point.

These findings and conclusions are not clearly erroneous.

At the time of Movant's trial in October 2012, "Missouri courts follow[ed] the

guidelines established in *Frye* when determining the admissibility of expert testimony in

criminal cases." **State v. Hightower**, 511 S.W.3d 454, 457, 459 n.7 (Mo. App. 2017) (apply

the law at the time of trial). "Under *Frye*, to be admissible an expert's opinion must be based

on scientific principles which are 'generally accepted' in the relevant scientific field." **Id**. at

458 (citation omitted).

16

All three experts (Davis, Dr. Long and Dr. Brown) appeared to base their opinions on the work of Dr. Barry Logan and subsequent studies and reports, all of which were generally accepted in the scientific field of toxicology. Those studies and reports included a NHTSA document stating a "typical" therapeutic range for methamphetamine was 20 to 50 nanograms per milliliter of blood.[8] Although Dr. Long and Davis were not able to give an opinion as to a specific degree of impairment based on blood concentration alone, each expert opined that a blood concentration of 193 nanograms of methamphetamine per milliliter would impair the individual's motor and driving skills to some degree, regardless of phase or sensitivity to methamphetamine. Relying on that same body of research, Dr. Brown testified that he could not give an opinion as to the existence of any impairment based on blood concentration alone, even with a blood concentration of 193 nanograms. This conflict between experts about what opinions could be drawn from the same generally accepted scientific research presented a fact question for the jury to resolve. It did not present a bar to admission of the differing opinions of the State's experts pursuant to *Frye*.[9]

The motion court did not clearly err by concluding that Movant failed to prove that the opinions of Dr. Long and Davis were inadmissible under *Frye*. Therefore, Point 3 is denied.

*Point 4 – Failure to Cross-Examine Witnesses*

In Movant's fourth point, he contends the motion court erred by denying Movant's claim that trial counsel was ineffective in failing to effectively cross-examine Cpl. Halford.

---

[8] Dr. Long testified the therapeutic range for methamphetamine would be less than for the significantly less potent drug amphetamine, and the "high end of therapeutic" for amphetamine "would be less than 60 nanograms per mill[.]"

[9] Although relevant when this case was tried in 2012, *Frye* has since been superseded by § 490.065 RSMo Cum. Supp. (2019). *See State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 319 (Mo. App. 2018). On August 28, 2017, amendments to § 490.065 became effective addressing the standard for admission of expert testimony in Missouri courts. *State v. Carter*, 559 S.W.3d 92, 94 n.3 (Mo. App. 2018).

Movant argues that trial counsel should have cross-examined Cpl. Halford with respect to: (1) his failure to complete all 12 steps of the drug-recognition protocol; and (2) his testimony about the accuracy rate for his drug-recognition evaluations. The motion court denied the claim, and that decision was not clearly erroneous.

Cpl. Halford's inability to complete the entire drug-recognition evaluation was the result of Movant's own conduct. Cpl. Halford testified that Movant had a change of attitude during a break in the interview at the hospital and declined to participate in any further evaluation. As the motion court concluded, Cpl. Halford could give his opinion, based upon his personal observations, about whether Movant was impaired. Moreover, the accuracy of that opinion was supported by other testimony that Movant had a blood concentration of 193 nanograms of methamphetamine per milliliter. For the same reason, trial counsel's failure to cross-examine Cpl. Halford about his accuracy rate had no effect on the outcome of the trial. Accordingly, Point 4 is denied.

*Point 5 – Failure to Present Evidence of Movant's Physical Disability*

In Movant's fifth point, he contends the motion court erred in denying Movant's claim that trial counsel was ineffective for failing to present evidence that Movant was blind in his left eye. The motion court denied the claim because the decision was a matter of trial strategy. Trial counsel testified that she asked other attorneys and staff at her office whether to bring this fact to the jury's attention. The universal reaction was that presenting such evidence would make Movant's actions appear more reckless. Admission of this evidence would have increased, rather than lessened, the prospect of his conviction. Therefore, trial counsel made the strategic decision not to present the evidence. The motion court believed that testimony. The court's finding and conclusions as to this claim are not clearly erroneous. Point 5 is denied.

18

*Point 6 – Failure to Conduct an Appropriate Voir Dire*

In Movant's sixth point, he contends the motion court erred by denying his claim that trial counsel was ineffective in failing to conduct an appropriate *voir dire*. Movant argues that trial counsel asked only one question in her portion of the *voir dire* examination. This point arises from the following facts.

The prosecutor's *voir dire* spanned 40 pages of the trial transcript. After that concluded, trial counsel told the venire that the prosecutor "asked almost all my questions, so I just have a couple." Several members of the venire panel asked to speak privately with the trial court and counsel in Movant's presence. Trial counsel actively participated in those conversations, including discussion of media coverage, a pending criminal case of the child of a venireperson, and a venireperson's knowledge of a victim in the case. Trial counsel also demonstrated that she had listened closely during the prosecutor's *voir dire*. After the trial court had suggested strikes for cause and the prosecutor stated that she did not request any other strikes for cause, Movant's trial counsel moved to strike five additional venirepersons for cause. The trial court granted four of those requests, including one over the objection of the prosecutor.

The motion court denied Movant's claim concerning trial counsel's alleged improper *voir dire* for the following reasons:

> [Movant] alleges [trial counsel] was ineffective for failing to ask more than one question of the jury during voir dire. [Movant] was not prejudiced by [trial counsel] only asking one question during voir dire as the state had completed a very thorough voir dire which was designed to expose any prejudices held by any potential jurors. [Movant] has not met his burden that counsel was ineffective in this respect.

These findings and conclusions are not clearly erroneous. Neither Movant's point relied on nor argument identifies any additional questions that should have been asked the venire. He presented no evidence at the evidentiary hearing to prove that additional questions

19

would have revealed a venireperson who: (1) was unqualified to serve on the jury; (2) should have been struck for cause; or (3) would have been a better choice for a peremptory strike than those selected by trial counsel. Accordingly, Point 6 is denied.

*Point 7 – Accumulated Failures Provided Movant with No Meaningful Defense*

In Movant's seventh point, he contends the motion court erred in denying the claim that trial counsel's "accumulated failures" provided Movant with "no meaningful defense." Having already concluded that the motion court did not clearly err in denying Movant's first six points, this point lacks merit. *See **McDaniel v. State***, 460 S.W.3d 18, 34 (Mo. App. 2014) (in the context of multiple ineffective assistance of counsel claims, "numerous non-errors" cannot aggregate to produce error); ***State v. Griffith***, 312 S.W.3d 413, 424 (Mo. App. 2010) (applying the same rule in the context of a direct appeal). Point 7 is denied.

The motion court's order denying Rule 29.15 relief is affirmed.


JEFFREY W. BATES, J. – OPINION AUTHOR

WILLIAM W. FRANCIS, JR., P.J. – CONCUR

JACK A. L. GOODMAN, J. – CONCUR